IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| M.H., a minor child, by and through his mother and legal guardian, THELMA LYNAH, S.R., a minor child, by and through her father and natural guardian CHARLES REGNA,<br><br>               Plaintiffs,<br>    v.<br><br>CLYDE L. REESE III, Esq., in his official capacity as Commissioner of THE DEPARTMENT OF COMMUNITY HEALTH,<br><br>               Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>COMPLAINT – Class Action<br><br>CIVIL ACTION<br>FILE NO. _____ |

## CLASS ACTION COMPLAINT FOR
## INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs M.H. and S.R., both minor children, by and through their legal

guardians, bring this action on behalf of themselves and all similarly situated

individuals pursuant to 42 U.S.C. §1983 for injunctive and declaratory relief

against Defendant Clyde L. Reese III, Esq., in his official capacity as the

Commissioner of Georgia's Department of Community Health, to redress

Defendant's violations of the Plaintiff's rights under the Medicaid Act, 42 U.S.C.

§1396 *et seq* and the U.S. Constitution.

## NATURE OF PROCEEDINGS

1.      M.H. is a thirteen-year-old boy who was nearly drowned as a toddler. This experience caused a catastrophic brain injury and resulted in many serious conditions, including static encephalopathy (brain injury), cerebral palsy, spastic quadriplegia with sustained clonus (involuntary muscle contractions and relaxations) in all four extremities, seizure disorder, chronic lung disease, chronic upper airway obstruction, gastroesophageal reflux, scoliosis with curvatures, fragile bones, and a significant intellectual disability. M.H. is a Georgia Medicaid recipient. M.H. cannot speak or express his needs, and requires constant supervision and assistance with all activities of daily life. M.H.'s multiple and complex conditions require constant monitoring, care and treatment by a skilled nurse. His treating physician has prescribed 18 hours per day of skilled nursing services and 6 hours per day of personal care services as medically necessary to correct or ameliorate his conditions. M.H. also requires case management services to help manage and coordinate the care of his many complex conditions.

2.      M.H. receives private duty nursing through the Georgia Pediatric Program (GAPP), the service-delivery model under Georgia's Medicaid program for providing in-home skilled nursing care to eligible children. M.H. currently

receives 18 hours per day of in-home skilled nursing care under the GAPP program as prescribed by his treating physician. On April 1, 2015, M.H. received an initial notice that his nursing hours would be placed on a "weaning schedule" and that his hours would be incrementally reduced from 18 hours per day to 12 hours per day over a period of 8 weeks, beginning on May 3, 2015.  Defendant has also failed to provide medically necessary personal care services to M.H. as prescribed by his treating physician.

3.     S.R. is a seven-year-old girl with multiple diagnoses and complex healthcare needs. She is a Georgia Medicaid recipient. Among her many diagnoses are cerebral palsy, chronic respiratory insufficiency, recurrent pulmonary aspiration, hyper-responsive airways, hydrocephalus (necessitating a brain shunt), seizure disorder, gastroesophageal reflux, dysphagia, chronic rhinitis and a significant intellectual disability. S.R. was born prematurely at only 26 weeks gestation. She cannot speak or express her needs, and requires constant supervision and assistance with all activities of daily life. S.R.'s multiple and complex conditions require constant monitoring, care and treatment by a skilled nurse. Her treating physician has prescribed 16 hours per day of skilled nursing services as medically necessary to correct or ameliorate her conditions. S.R. also requires case management services to help manage and coordinate the care of her many complex

conditions.

4.      S.R. receives private duty nursing through the GAPP program. S.R. has been hospitalized nine times since August 2014. In one instance, S.R. was hospitalized for more than one month. Due to her worsening condition, increased care needs, and recurrent hospitalization, her treating physician has requested an increase in the number of nursing hours that S.R. receives through GAPP three times since September 2014. All three requests were denied (in full or in part). S.R.'s treating physician believes that S.R. requires 112 hours per week of nursing care to keep her in good health. But S.R. has been approved for, and currently receives, only 84 hours per week of nursing care.

5.      The Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions of the Medicaid Act require states to provide Medicaid-eligible children with all necessary health care and other services necessary to "correct or ameliorate" the child's condition. 42 U.S.C. § 1396d(r)(5). This includes private-duty nursing, personal care services, and case management. *See* 42 U.S.C. §1396d(a)(8), §1396d(a)(24), & §1396d(a)(25); *see also* Moore ex rel. Moore v. Reese, 637 F.3d 1220, 1224 (11th Cir. 2011).

6.      The Medicaid Act and the U.S. Constitution also require Defendant to provide Plaintiffs with sufficient notice when he is denying or reducing services.

This notice must include a statement of what action the state intends to take and the reasons for the intended action. In order to be effective, such notice must include the legal and factual bases for the decision.

7.     Defendant fails to meet his obligations under the Medicaid Act and the U.S. Constitution in the following ways:

- Defendant applies policies that serve to limit or reduce the amount of in-home skilled nursing care received by Plaintiffs and similarly situated individuals irrespective of medical necessity as determined by their treating physicians.

- Defendant has failed to provide access to medically necessary personal care services through the State Medicaid plan or EPSDT to children and youth under the age of 21 who are eligible for Medicaid in Georgia.

- Defendant has failed to provide access to case management services through the State Medicaid plan or EPSDT to children and youth between the ages of 3 and 21 who are eligible for Medicaid in Georgia.

- Defendant has failed to provide the Plaintiffs and similarly situated individuals with sufficient notice of denials and reductions: The denial

5

letters fail to provide specific reasons for the denials or reductions,

contain incorrect citations, and assert misleading or false claims.

8.      Plaintiffs seek declaratory and injunctive relief on behalf of

themselves and similarly situated individuals to enjoin Defendant from continued

violations of the Medicaid Act and the U.S. Constitution by continuing to deny

Plaintiffs medically necessary services and by failing to provide appropriate notice

of denials or reductions of services.[1]

## JURISDICTION AND VENUE

9.      This civil action is authorized by 42 U.S.C. § 1983 to redress the

deprivation under color of law of rights guaranteed by the Medicaid Act and the

U.S. Constitution.  This Court has jurisdiction over this action pursuant to 28

U.S.C. §§ 1331 and 1343.

10.     This Court has authority to grant Plaintiffs' claims for declaratory and

injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of

the Federal Rules of Civil Procedure.

11.     Venue is proper in the United States District Court for the Northern of

---

[1] This is the second action brought on behalf of Plaintiffs M.H. and S.R. regarding Defendant's failure to provide them with medically necessary services in violation of the EPSDT provision of the Medicaid Act. *See Hunter v. Cook*, 1:08-CV-2930-TWT (N.D. Ga.).

Georgia pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

12.     Plaintiff M.H. is thirteen (13) years old and is a Medicaid beneficiary eligible to receive services under EPSDT. M.H. resides in Savannah, Georgia with his family. M.H. brings this action by and through Thelma Lynah, his adoptive mother and legal guardian.

13.     Plaintiff S.R. is seven (7) years old and is a Medicaid beneficiary eligible to receive services under EPSDT.  S.R. resides in Doraville, Georgia with her family. S.R. brings this action by and through her father and natural guardian, Charles Regna.

14.     Defendant Clyde L. Reese III, Esq., is the Commissioner of the Georgia Department of Community Health ("DCH"), the single state agency responsible for administering the Georgia Medicaid Program. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10; O.C.G.A. § 49–4–142.  As Commissioner of DCH, Defendant Reese is responsible for ensuring that the operation of the Georgia Medicaid Program fully complies with the Medicaid Act and its implementing regulations.  Defendant Reese is sued solely in his official capacity. (Throughout this complaint, Defendant Reese and DCH will sometimes be collectively referred to as "DCH.")

15.     At all times relevant to this action, Defendant has acted under color of state law.

16.     The State of Georgia participates in the Medicaid program, a voluntary federal-state partnership for payment of certain healthcare for persons eligible to receive Medicaid.

## M.H.

17.     M.H. is thirteen years old and lives at home with his mother and his brother. M.H. suffered a near drowning at 18 months of age which caused a severe brain injury. As a result, he has spastic quadriplegia, cerebral palsy, a significant intellectual disability,[2] and multiple other conditions.

18.     M.H. has a severe seizure disorder that is difficult to control even with multiple medications. He must be monitored and closely observed for seizure activity and so that immediate intervention may be initiated.

19.     M.H. has reactive airway disease and restrictive lung disease. He produces a lot of secretions.  Due to these conditions, M.H. requires regular suctioning of his secretions throughout the day and occasional deep suctioning. He requires chest wall oscillation therapy (this is known as "VEST therapy" and

---

[2] M.H. has been diagnosed with "severe mental retardation," an archaic and pejorative term.

involves the use of a specialized vibrating vest to dislodge secretions) three times per day.

20.     Deep suctioning is a skilled nursing task that only licensed nurses may perform.

21.     During the VEST therapy sessions M.H. requires constant observation, as the sudden mobilization of secretions can lead to airway obstruction and acute respiratory distress. When this occurs, the appropriate skilled intervention must be performed. If the VEST therapy is not performed properly and observed by a skilled person, it can cause a collapsed lung.

22.     Because of these respiratory conditions, M.H. is prone to recurring respiratory infections such as pneumonia.

23.     M.H. receives medication via a nebulizer two to three times daily and more often when ill. He also requires supplemental oxygen at 1.5 liters per minute (LPM) at night, and during the day as needed, via nasal cannula.

24.     M.H. currently has prescriptions for multiple medications, including several different seizure medications and medications to treat his respiratory conditions.  Some of the medications are given on an "as needed" basis, which

requires medical judgment, as does the effects of possible combinations of the medications.

25.     The administration of medication is a skilled nursing task that only licensed nurses may perform. Oxygen is classified as a medication in Georgia.

26.     Because he is at great risk for aspiration, M.H. is fed and receives all medications via his gastrostomy tube ("G-tube").

27.     Tube administered feedings have the potential to raise complications such as aspiration (i.e., the entry of material such as secretion, food, or stomach contents into the lungs).  If there is G-tube leakage, a skilled caregiver must make adjustments as necessary.

28.     The administration of a G-tube feed is a skilled nursing task that only licensed nurses may perform.

29.     M.H. cannot move. Because he has very fragile bones, M.H. must be carefully moved or repositioned to avoid fractures.

30.     M.H. must be repositioned frequently to ensure an open airway and to prevent the development of decubitus ulcers (bed sores) on his skin. M.H. is at high risk of skin breakdown due to his incontinence and immobility. This repositioning must be performed both during the day and at night. As he has grown, it has become more difficult to move M.H. He weighs over 130 pounds.  A

10

hoyer lift (a type of sling lift) is needed to transfer him from his bed to his chair. Ms. Lynah is 73 years old and has difficulty meeting M.H.'s constant need for repositioning when someone is not there to assist her.

31.    Because of the underlying complexity of M.H.'s many conditions, tasks that might usually be considered unskilled care are instead considered skilled care because they need to be performed or supervised by a skilled nurse (e.g., repositioning).

32.    M.H. is unable to speak and cannot communicate his wants and needs. Therefore his caregiver must anticipate his daily needs and provide appropriate care accordingly.

33.    M.H.'s multiple and complex conditions require constant monitoring, care and treatment by a knowledgeable and skilled caregiver.  M.H. requires ongoing and frequent skilled nursing assessments to determine when and what skilled interventions are necessary to maintain or improve the status of his health and conditions.  If these interventions are delayed or not performed, it can be expected that M.H.'s chronic conditions will deteriorate, resulting in further loss of function, imminent risk to his health, and even risk of death.

34.    M.H.'s treating physician, Dr. Ramon Ramos, has prescribed M.H. 18 hours per day of skilled nursing care.  He believes M.H. requires 18 hours per day

of skilled nursing care to maintain his health and ameliorate his conditions. Dr. Ramos believes that a reduction in skilled nursing services may have a devastating impact upon M.H.'s health and his ability to maintain his life at home.

35.    M.H. has received 18 hours of skilled nursing per day for several years.

36.    M.H. has greatly benefitted from this nursing. He has not had any unplanned hospitalizations or experienced any exacerbation of his chronic conditions.

37.    M.H.'s mother Ms. Lynah can perform many of the same tasks that the nurses perform, and she provides care to M.H. when there is no nurse in the house. But Ms. Lynah is not a trained nurse, and she cannot perform skilled nursing assessments or exercise nursing judgment.

38.    Ms. Lynah is 73 years old. It is becoming increasingly difficult for her to care for M.H. alone, and she cannot continue provide the level of care she was able to provide in the past without assistance.  M.H. is physically much bigger and is difficult to move or reposition.

39.    In addition to the 18 hours per day of skilled nursing, Dr. Ramos has prescribed M.H. six (6) hours per day of personal support services (i.e., unskilled care from a certified nursing assistant) to perform the daily care activities that

12

M.H. requires and that Ms. Lynah can no longer perform.

**S.R.**

40.    S.R. is seven years old and lives at home with her parents and her brothers. S.R. was born prematurely, at only 26 weeks gestation, and required mechanical ventilation for three months of her stay in the Neonatal Intensive Care Unit.

41.    S.R. has multiple systems diagnoses, including cerebral palsy, chronic respiratory insufficiency, recurrent pulmonary aspiration, hyper-responsive airways, shunted hydrocephalus, seizure disorder, gastroesophageal reflux, dysphagia, chronic rhinitis, a significant intellectual disability, and other serious medical conditions.

42.    S.R. requires numerous medications to maintain her health. For respiratory management, S.R. receives Xopenex via nebulizer treatments every three to four hours, and Atrovent is added up to four times daily. She also takes Flovent and Montelukast. S.R. also takes Ranitidine for gastroesophageal reflux; Keppra and Trileptal to control her seizures; Baclofen and Diazepam for cerebral palsy; and Lortab as needed for muscle spasms and pain.

43.    The administration of medication is a skilled nursing task that only licensed nurses may perform.

13

44.     In addition to her medication regime, S.R. requires multiple therapies to maintain her respiratory health. She receives nebulizer and chest wall oscillation therapy ( "VEST therapy") for airway clearance at least twice daily and up to every three hours when sick.

45.     The administration of nebulizer treatments is a skilled nursing task that only licensed nurses may perform.

46.     S.R.'s VEST therapy takes 15 to 20 minutes per treatment. During the VEST therapy sessions she requires constant observation, as the sudden mobilization of secretions can lead to airway obstruction and acute respiratory distress. When this occurs, S.R. must be repositioned and requires suctioning of her nasal and oral airways.

47.     In addition, S.R. requires frequent suctioning throughout the day due to ongoing insufficient airway clearance. She frequently requires deep suctioning of her throat through her nasal cavity.

48.     Deep suctioning is a skilled nursing task that only licensed nurses may perform.

49.     S.R. requires supplemental oxygen therapy at 1.5 to 3 liters per minute (lpm) to keep her oxygen saturation level above 93%. She has a home pulse oximeter to monitor her oxygen saturation levels and ensure that they remain at a

safe level.

50.      The administration of oxygen is a skilled nursing task that only licensed nurses may perform.

51.      While she is sleeping, S.R. must be positioned on her back and monitored for potential life-threatening apnea spells.

52.      Due to dysphagia (difficultly in swallowing), S.R. is gastrojejunostomy-tube ("GJ-tube," a surgically-placed tube that allows feeding directly to the stomach and small intestine) fed and receives 80cc of Pediasure per hour on a continuous basis. She is at high risk for aspiration and has been hospitalized for aspiration pneumonias in the past.

53.      The administration of a GJ-tube feed is a skilled nursing task that only licensed nurses may perform.

54.      S.R. has frequent seizures. She must be monitored and closely observed during a seizure so that immediate intervention can occur as needed for her to remain safe.

55.      S.R. is non-ambulatory. She uses a wheelchair to help with positioning and mobility. S.R. requires both physical and occupational therapy on a regular basis.

56.      Because of the underlying complexity of S.R.'s many conditions,

tasks that might usually be considered unskilled care are instead considered skilled care because they need to be performed or supervised by a skilled nurse.

57.     S.R. cannot speak or express her needs, and thus requires constant supervision and assistance with all activities of daily life.

58.     Because of her medically fragile condition and complex set of medically necessary services and treatments she requires, S.R. has been receiving skilled nursing services in her home through GAPP since 2008.

59.     S.R.'s multiple and complex conditions require constant monitoring, care and treatment.  S.R. requires ongoing and frequent skilled nursing assessments to determine when and what skilled interventions are necessary to maintain or improve the status of her health and conditions.  If these interventions are delayed or not performed, it can be expected that S.R.'s chronic conditions will deteriorate, resulting in further loss of function, imminent risk to her health, and even risk of death.

### THE GEORGIA PEDIATRIC PROGRAM (GAPP)

60.     The Georgia Department of Community Health ("DCH") created the GAPP program as its service-delivery model for providing nursing care in the home to "medically fragile" children with multiple systems diagnoses.

61.     The sole service provided by the GAPP program is in-home skilled

nursing.

62.     Once found eligible, children who participate in the program must be recertified every three to six months. During recertification, the number of nursing hours received by the child is reevaluated and subject to adjustment.

63.     DCH has delegated to the Georgia Medical Care Foundation, Inc. ("GMCF"), the task of reviewing and deciding whether to approve or deny all requests for nursing services that are made by treating physicians on behalf of Medicaid-eligible children seeking nursing services through GAPP.

64.     Among the decisions delegated to GMCF is whether to grant the number of weekly skilled nursing hours requested on behalf of Medicaid-eligible children, or whether to provide fewer hours than the treating physician believes to be necessary.

65.     GMCF, in making decisions to grant or deny services through GAPP, acts on behalf of DCH.

66.     GMCF  applies the policies and procedures of the GAPP program when it denies requests for prior approval for nursing services – either by denying approval for any services or by approving less of the service than was requested – regardless of what the treating physician has determined is medically necessary to correct or ameliorate the child's condition.

67.     Federal law requires DCH to provide skilled nursing sufficient in amount, duration and scope to achieve the purpose of EPSDT – to correct or ameliorate the child's conditions.

68.     Georgia law defines "medically necessary services" to mean "services or treatments that are prescribed by a physician or other licensed practitioner and which, pursuant to the EPSDT Program, diagnose or correct or ameliorate defects, physical and mental illnesses, and health conditions, whether or not such services are in the state plan." O.C.G.A. § 49-4-169.1(4)

69.     In Georgia, the phrase "correct or ameliorate" has been defined by state statute to mean to "improve or maintain a child's health in the best condition possible, compensate for a health problem, prevent it from worsening, prevent the development of additional health problems, or improve or maintain a child's overall health, even if treatment or services will not cure the recipient's overall health." O.C.G.A. § 49-4-169.1(1).

70.     In determining the amount of skilled nursing hours provided to children who participate in the GAPP program, DCH and GMCF use criteria that are not based on medical necessity.

71.     Instead, DCH and GMCF use the following justifications to limit the amount of nursing hours provided:

18

- The purpose of the GAPP program is to teach and wean;

- The length of time the child has been in the program or the length of time since the last reduction in hours;

- The competency of the parents to perform skilled tasks;

- Claiming that skilled tasks are unskilled;

- Lack of evidence of medical necessity; and

- Convenience of the caregiver.

72.     The justifications and rationale employed by Defendant fail to identify all the needs of the child and trivialize those needs that are recognized. The needs of the child are treated as the needs of the parent.

73.     It is GAPP policy and practice to use the same boilerplate reasons to deny or reduce skilled nursing services provided to Plaintiffs and all children who participate in the GAPP program.

### REDUCTION OF M.H.'S SKILLED NURSING SERVICES

74.     M.H. currently receives 18 hours per day of in-home skilled nursing through the GAPP Program.

75.     On April 1, 2015, GMCF sent a letter to Ms. Lynah notifying her that M.H. was being placed on a "weaning schedule" and that his nursing hours would be incrementally reduced from 18 hours per day to 12 hours per day over a period

of 8 weeks, beginning on May 3, 2015.  Specifically, the weaning schedule

proposed by GMCF provided that M.H. would receive 18 hours per day until May

3, followed by 16 hours per day for four weeks, followed by 14 hours per day for 4

weeks, and 12 hours per day thereafter.

76.    The letter states that there was a determination that M.H. "require[d]

fewer medically necessary services for IHSN [in-home skilled nursing]." The letter

cited the following reasons in support of this determination:

- The nurse's notes reviewed for the past 3 months document the stability of your child's condition.
- Although your child is having seizures, having skilled nursing will not prevent their occurrence, duration or intensity[.]
- Oxygen saturations are documented to be within acceptable range for this child per MD order.
- Your child requires oxygen via nasal cannula, frequent suctioning, pulse oximetry, daily CPT, G-tube/nebulizer medications; all of which are not so inherently complex to require a professional licensed person on a daily basis.
- Your child's condition has remained stable with no exacerbations in disease process or unplanned hospitalizations since last pre-certification period.
- There is no documentation of recent hospitalizations or exacerbations in condition in the nurse's notes or assessment . . . .
- There is no evidence from the documentation submitted that the current hours are medically necessary to correct or ameliorate the child's medical condition.
- Skilled nursing hours cannot be granted for projected potential problems. It is to provide for the current skilled need of the child.
- Skilled nursing is granted based on those medically necessary to meet the child's needs.
- Feeding tubes are not so inherently complex to require a

20

professional licensed person on a daily basis.

- Non-covered GAPP services include "Services for back up support or respite purposes for the primary or secondary caregiver."
- Therapy services such as Physical Therapy, Occupational Therapy and Speech Therapy may be obtained through Medicaid's Children Intervention Services Program . . . .
- All other sources of reimbursement must be exhausted prior to seeking reimbursement from the Department of Community Health. . . .
- Your child may be eligible for the Elderly and Disabled Waiver Program. This program provides Personal Support Services (PSS) which provides personal care tasks such as . . . assistance with activities of daily living . . .

77.    The letter outlining the proposed reductions in hours did not address or consider Ms. Lynah's capacity to assume increased amounts of care. Ms. Lynah has another adopted son with a significant developmental disability who lives with her and for whom she provides care.

**DENIAL OF ADDITIONAL SKILLED NURSING SERVICES TO S.R.**

78.    S.R. has been increasingly unstable since July 2014 and has required nine hospitalizations since then due to respiratory distress. She was also admitted to the emergency room at least once (same-day discharge) during this period.

79.    On August 18, 2014, S.R. was admitted to the emergency room with a fever of 101F.

80.    Shortly thereafter, S.R. was hospitalized from August 28, 2014, to

September 7, 2014. She was hospitalized for respiratory distress and diagnosed with rhinovirus and enterovirus. She demonstrated respiratory failure during admission and was admitted to the ICU.

81.    S.R was hospitalized again from September 15, 2014, to September 16, 2014 – this time for fever, desaturation (decrease in blood oxygen levels), and increased respiratory symptoms.

82.    At a September 23, 2014, office visit with S.R.'s treating physician, Peter Scott, M.D., he prescribed BiPAP therapy due to S.R.'s chronic respiratory insufficiency. On September 25, 2014, Dr. Scott wrote a letter of medical necessity recommending an increase in S.R.'s nursing hours to 84 hours per week due to her recent hospitalizations, which indicated her increasing instability, and her increased care needs (i.e., the BiPAP). Prior to this, S.R. had been receiving 60 hours of skilled nursing per week.

83.    GMCF denied this request for additional hours on October 8, 2014. (The final denial letter was issued on November 19, 2014.) GMCF approved a temporary increase to 84 hours per week until November 30, 2014, but determined that S.R.'s hours would return to 60 hours per week after that date.

84.    S.R. was hospitalized again from September 28, 2014 through October 4, 2014, for respiratory distress, increased oxygen requirements, and a

fever of 104F.

85.     On October 27, 2014, S.R. had an office visit with Dr. Scott. Dr. Scott decided that S.R. should be withdrawn from school and instead receive homebound instruction due to the need to minimize her exposure to infection and because of her current respiratory and neurological state. Dr. Scott determined that S.R. was at high risk for further hospitalization due to her poor pulmonary reserve and the rapid deterioration she experienced when exposed to respiratory infections.

86.     On November 5, 2014, Dr. Scott wrote a letter of medical necessity recommending an increase to 112 hours per week now that S.R. was out of school and at home full time.

87.     GMCF denied the request for 112 hours on November 19, 2014. (The final denial letter was issued on December 31, 2014.) GMCF instead approved 84 hours per week until February 28, 2015.

88.     S.R. was hospitalized again from November 20, 2014 through November 26, 2014.

89.      S.R was hospitalized again from December 3, 2014 to December 9, 2014. She was brought to the Emergency Room in an ambulance after experiencing desaturation leading to cyanotic spells (turning blue due to failure to breathe), and she was admitted to the ICU.

90.     S.R was hospitalized again from December 25, 2014 to December 28, 2014. S.R. was admitted for a flu infection and worsening hypoxemia (an abnormally low level of oxygen in the blood).

91.     S.R was hospitalized again from January 8, 2015, to February 10, 2015 – a stay of 33 days. Upon admission she was diagnosed with respiratory distress, viral upper respiratory infection, and hypoxia (inadequate oxygen), and she was transferred to the PICU. During this hospitalization, S.R. required intubation (the placement of a flexible plastic tube into the trachea to maintain an open airway) and was placed on a ventilator.

92.     On February 3, 2015, while S.R. was still hospitalized, Dr. Scott wrote a letter of medical necessity again requesting 112 hours per week of skilled nursing. Dr. Scott explained that S.R. was currently hospitalized, and he stated that "[u]pon return home, [S.R.] will require constant supervision and evaluation by medical personnel to prevent further life threatening events." Due to S.R.'s "significantly increased care needs and the need for continuous monitoring of pulmonary status, oxygenation, respiratory rate and effort, and heart rate," Dr. Scott recommended that S.R. receive 112 hours per week of skilled nursing care.

93.     GMCF denied the request for 112 hours on February 25, 2015. (The final denial letter was issued on April 8, 2015.) GMCF instead approved 84 hours

per week until May 31, 2015.

94.    The denial letter cited the following reasons in support of this

determination:

- Although your child is having seizures, having skilled nursing will not prevent their occurrence, duration or intensity[.]
- Your child requires supplemental oxygen, suctioning as needed, pulse oximetry, daily CPT, G-tube/nebulizer medications; all of which are not so inherently complex to require a professional licensed person on a daily basis.
- There is no evidence from the documentation submitted that the current hours are medically necessary to correct or ameliorate the child's medical condition.
- Skilled nursing hours cannot be granted for projected potential problems. It is to provide for the current skilled need of the child.
- Skilled nursing is granted based on those medically necessary to meet the child's needs.
- Feeding tubes are not so inherently complex to require a professional licensed person on a daily basis.
- Non-covered GAPP services include "Services for back up support or respite purposes for the primary or secondary caregiver."
- Therapy services such as Physical Therapy, Occupational Therapy and Speech Therapy may be obtained through Medicaid's Children Intervention Services Program . . . .
- All other sources of reimbursement must be exhausted prior to seeking reimbursement from the Department of Community Health. . . .
- Your child may be eligible for the Elderly and Disabled Waiver Program. This program provides Personal Support Services (PSS) which provides personal care tasks such as . . . assistance with activities of daily living . . .
- Reviewer Comments: While your child was recently hospitalized, the skilled hours allotted should meet his/her current skilled needs.

95.    S.R. has been hospitalized twice more since then, from March 9,

2015, to March 17, 2015, and from April 1, 2015, to April 6, 2015.

96.    S.R.'s treating physician has prescribed 112 hours of in-home skilled nursing hours per week. Dr. Scott believes that 112 hours are medically necessary to ameliorate S.R.'s condition.

## LACK OF ADEQUATE NOTICE

97.    M.H. and S.R. have both received letters of notification from GMCF informing them that their hours of in-home skilled nursing are being reduced or denied.

98.    These letters fail to inform M.H. and S.R. of the specific factual and legal bases for the denials or reductions, contain incorrect citations, and assert misleading or false claims.

99.    Plaintiffs' treating physicians have clearly explained why Plaintiffs require specific amounts of skilled nursing services. GMCF has failed to provide specific facts related to Plaintiffs' conditions or care needs that justify the reduction or denial of skilled nursing care. Instead, the letters from GMCF contain boilerplate language and blanket statements. For example, the denial letters all include the blanket assertion that there is "no evidence from the documentation submitted that the requested hours are medically necessary."

100.   Moreover, the numerous errors contained in these letters further

obfuscate the alleged justification for the denial of services, impinging upon Plaintiffs' right to respond in a meaningful manner.

101.   The GMCF denial letters justify the denial of nursing hours in part by citing 42 USCS §1382(h)(b), which does not exist.

102.   The GMCF denial letters justify the denial of nursing hours by in part by citing Georgia Pediatric Program Manual §702.2.A, which does not exist.

103.   The GMCF denial letters erroneously state that individuals served by the GAPP program "are required to meet the same level of care as for admission to a hospital or nursing facility." The section of DCH's GAPP policy manual cited by the letter – Section 601 – states the exact opposite. *Part II Policies and Practices for the Georgia Pediatric Program (GAPP) In-Home Skilled Nursing* (April 1, 2015), *available at*

https://www.mmis.georgia.gov/portal/Portals/0/StaticContent/Public/ALL/HAND BOOKS/GAPP%20IHSN%20Manual%20%2001-04-2015%20151840.pdf

(hereinafter "GAPP Manual") at § 601 (stating that participants "are no longer required to meet the same level of care as for admission to a hospital or skilled nursing facility").

104.   The GMCF denial letters cite to the federal regulations regarding criteria for facilities. *E.g.,* 42 CFR 409.31& 42 CFR 440.10. These regulations are

irrelevant.

105.   The GMCF denial letters advise Plaintiffs to seek personal support services under Georgia's Elderly & Disabled Waiver Program.

106.   Defendant cannot provide services to Plaintiffs through a Medicaid Waiver that are required to be covered through EPSDT.  Defendant is required by EPSDT to provide any personal support services necessary to correct or ameliorate Plaintiffs' conditions.  Defendant is prohibited by the terms of the Medicaid Waivers from using Medicaid Waiver funds to pay for services that may be covered under the state Medicaid plan or EPSDT.

107.   The GMCF denial letters incorrectly cite to section 905(G) of the GAPP Manual for the policy that respite services for the primary or secondary caregiver are not covered under the GAPP program. This policy is found in section 906 of the Manual.

108.   The "final" denial letters from GMCF state that GAPP services have been denied in accordance with 42 CFR 435.225. This regulation does not address the provision of skilled nursing services; rather, it addresses Medicaid eligibility for children whose family household income would typically disqualify them for coverage under Medicaid, and is therefore completely irrelevant to the provision of skilled nursing under GAPP.

## PLAINTIFFS ARE AT SERIOUS RISK OF HARM

109.   Defendant's refusal to provide medically necessary nursing services violates Plaintiffs' rights under the EPSDT provisions of the Medicaid Act, which requires the prompt provision of all necessary care.

110.   M.H.'s treating physician has prescribed 18 hours per day of skilled nursing and six (6) hours per day of personal care services as medically necessary to correct or ameliorate his conditions. These services are essential to maintain M.H.'s health.

111.   S.R.'s treating physician has prescribed 16 hours per day of skilled nursing as medically necessary to correct or ameliorate her conditions. These services are essential to S.R.'s well-being.

112.   Defendant's failure to provide sufficient healthcare services as prescribed by M.H.'s treating physician, including skilled nursing and personal care services, places M.H. at serious risk of harm, including hospitalization and death.

113.   Defendant's failure to provide sufficient skilled nursing hours places S.R. at serious risk of harm, including respiratory failure, hospitalization, and death.

## MEDICAID FRAMEWORK & SERVICES

114.   In 1965, Congress enacted Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* ("the Medicaid Act"), establishing the Medicaid program, a voluntary, cooperative, federal-state program to provide necessary medical services to eligible beneficiaries.

115.   Although state participation and the Medicaid program is voluntary, once a state elects to participate, the state must comply with all federal requirements governing the program.

116.   Georgia has elected to participate in the Medicaid program and is obligated to comply with all federal requirements governing the Medicaid program.

117.   The purpose of the Medicaid program is to enable each State "to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care . . . ." 42 U.S.C. § 1396-1.

118.   The Medicaid Act defines "medical assistance" as payment for the cost of care and services included in an enumerated list of twenty-seven (27) general health care ("medical assistance") categories.  42 U.S.C. § 1396d(a).

Some of these categories must be included in the state plan (mandatory categories), while others may be included at the option of the state (optional categories). 42 U.S.C. §1396a(a)(10)(A).

119.   Under the provisions of the Medicaid Act, each participating state's Medicaid plan must provide the following mandatory categories of services: inpatient and outpatient hospital services; other laboratory and x-rays; early and periodic screening, diagnostic and treatment services ("EPSDT") for beneficiaries under age twenty-one; physician services; nurse-midwife services; and certified pediatric and nurse practitioner services. 42 U.S.C. §§ 1396a, 1396d; 42 C.F.R. §440.210.

120.   The Medicaid Act requires states participating in Medicaid to provide certain services to Medicaid-eligible children under 21 years of age. The provisions of the Medicaid Act specific to beneficiaries under age 21 years are known as Early and Periodic Screening, Diagnostic, and Treatment, or EPSDT, set forth at 42 U.S.C. §1396d(r).

121.   The EPSDT provisions of the Medicaid Act require that states provide children "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in [§ 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services,

31

**whether or not such services are covered under the State plan.**" 42 U.S.C. §

1396d(r)(5) (emphasis added).

122.   42 U.S.C. §1396d(a) lists broad categories of healthcare services that

are covered by the Medicaid Act.

123.   Private duty nursing services is one of the enumerated categories of

service under subsection (a), *i.e.*, 42 U.S.C. §1396d(a)(8).

124.   Personal care services is one of the enumerated categories of service

under subsection (a), *i.e.*, 42 U.S.C. §1396d(a)(24).

125.   Case management services is one of the enumerated categories of

service under subsection (a), *i.e.*, 42 U.S.C. §1396d(a)(25).

126.   Georgia, as a participant in the Medicaid program, must provide all

care, treatment and services covered by the categories of service in the Medicaid

Act that are necessary to correct or ameliorate the conditions and illnesses of

Medicaid eligible children under 21 years of age in Georgia under EPSDT.

127.   Under the Medicaid Act, Georgia Medicaid must arrange for EPSDT

treatment services when the need for such services has been disclosed. 42 U.S.C.

§1396a(a)(43).

## EPSDT & MEDICAID WAIVER PROGRAMS

128.   In addition to the services provided under their state Medicaid plans,

states may seek HHS approval to provide home and community-based services

("HCBS") to individuals who would otherwise require institutional care under

special programs known as "waiver programs."

129.   The programs and services encouraged by the waiver programs

specifically include increased provision of home and community based health care

to Medicaid recipients who would otherwise qualify for admission to a facility. *See*

42 U.S.C. § 1396n(c)(1).

130.   Georgia can offer a variety of services under an HCBS Waiver

program, including standard healthcare services covered by 42 U.S.C. §1396d(a)

and other services not traditionally covered by Medicaid.

131.   Georgia has a variety of waivers, each of which provide a defined

package of home and community based services. Each waiver has limits on the

type and amount of services available for participants.

132.   Waiver services are intended to be in addition to the state Medicaid

plan.  They do not supplant state Medicaid plan services.  If a service or treatment

is covered by Georgia's state Medicaid plan, the state Medicaid benefit must be

exhausted first before the same service or treatment may be furnished under an

HCBS Waiver.

133.   Because the Medicaid Act mandates that all Medicaid-eligible

children receive all medically necessary services listed in 42 U.S.C. §1396d(a)

regardless of whether such services are specifically included in the state Medicaid

plan, HCBS Waivers **may not** provide for the coverage of services that could be

furnished to children under EPSDT. *See* 42 U.S.C. §1396d(r)(5); CMS,

*Instructions, Technical Guide and Review Criteria for § 1915(c) Home and*

*Community Based Waiver* 112 (January 2008), *available at*

http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-

Topics/Waivers/Downloads/Technical-Guidance.pdf.

## PRIVATE DUTY NURSING SERVICES

134.   As a state participating in the Medicaid program, Georgia must

provide private duty nursing services to Medicaid-eligible children under 21 years

of age when this service is necessary to correct or ameliorate a child's condition.

135.   "Private duty nursing services" are defined in the Code of Federal

Regulations, 42 C.F.R. §440.80. In pertinent part, private duty nursing services are

defined as nursing services for individuals "who require more individual and

continuous care than is available from a visiting nurse or routinely provided by the

nursing staff of the hospital or skilled nursing facility." 42 C.F.R. §440.80. These

services are provided by a registered nurse or a licensed practical nurse under the

direction of a physician and may be provided in an individual's home. *Id.*

34

136.   There are two separate parts to the GAPP program: the in-home skilled nursing program and the medically fragile daycare program. These two programs are separately administered.

137.   The In-Home Skilled Nursing GAPP program is the service-delivery model under Georgia's Medicaid program for providing in-home skilled nursing care to eligible children. The only service provided through the In-Home Skilled Nursing GAPP program is in-home skilled nursing care.  The program does not provide personal support services or case management.

138.   In Georgia, a child who is eligible to receive EPSDT services cannot receive the EPSDT private duty nursing benefit unless the child is enrolled in GAPP.

139.   GAPP is designed as a "teaching and weaning" program.   One of the primary goals of the GAPP program is the reduction of skilled nursing services provided to children through the program by teaching parents to perform and assume increasing amounts of skilled care for their child.

140.   Although DCH has revised the language in its GAPP Manual over the last several years, the GAPP policy of weaning skilled nursing care and offloading the responsibility to provide skilled care onto already overburdened caregivers remains in effect, as reflected in these provisions in the current GAPP Manual:

35

**702.1**          **Medicaid Eligible Members**

. . .

Acceptance of members into the Georgia
Pediatric Program (GAPP) must be based on
all of the following criteria:

. . .

B.      . . . The primary caregiver must assist
with the member's care in the home . . .

C.      The availability and ability of the
caregiver(s) to actively participate in
the care of the member. . . .

D.      The number of hours for which
approval will be granted is based on . . .
the documented training needs of the
primary caregiver . . . .

E.      The expectation that the primary
caregiver(s) will become competent to
assume some responsibility for the care
of the child.

**803. A.**      GAPP Letter of Notification/Adverse Action

. . .

(c)      One of the goals of the Georgia
Pediatric Program is teach the parents and
caregivers how to safely care for the
member in the absence of a nurse.

141.   The GAPP policy of weaning skilled nursing care and offloading the

responsibility to provide skilled care onto parents is demonstrated by Defendant's policy and practice of reducing the amount of skilled nursing care provided to a child when the child's condition has not changed or improved.

142.   This GAPP policy of pushing increasing amounts of skilled care onto parents – irrespective of the needs of the child for skilled nursing care or the parents' competency or capacity to provide such care – violates the EPSDT mandate that children must be provided with all medically necessary services to correct or ameliorate their conditions and places Medicaid eligible children at risk of harm and poor healthcare outcomes.

## PERSONAL CARE SERVICES

143.   As a state participating in the Medicaid program, Georgia must provide personal care services to Medicaid-eligible children under 21 years of age when this service is necessary to correct or ameliorate a child's condition.

144.   Personal care services are defined in the State Medicaid Manual, issued by the Centers for Medicare & Medicaid Services. *The State Medicaid Manual*, Chapter 4, § 4480. Personal care services "may include a range of human assistance provided to persons with disabilities and chronic conditions of all ages which enables them to accomplish tasks that they would normally do for themselves if they did not have a disability." *Id.* at 4-495. "Such assistance most

37

often relates to performance of ADLs [activities of daily living]," including "eating, bathing, dressing, toileting, transferring, and maintaining continence." *Id.* "Personal care services can be provided on a continuing basis or on episodic occasions.  Skilled services that may be performed only by a health professional are not considered personal care services." *Id.*

145.   The term "personal support services" is generally used in Georgia instead of "personal care services." These terms are interchangeable.

146.   Georgia does not make personal care services available as a benefit under the Georgia State Medicaid Plan.

147.   Personal care services are not available as an EPSDT service for Medicaid-eligible children under the age of 21 in Georgia.

148.   In Georgia, Medicaid waivers provide personal care services as a limited service. Each waiver contains amount and duration limits for personal care services.

149.   Under EPSDT, the amount and duration of personal care services is based upon medical necessity. There cannot be specified limits on services.

150.   In Georgia, the only way for Medicaid-eligible children to access personal care services is through a waiver program, such as the Service Options Using Resources in a Community Environment ("SOURCE"), Community Care

38

Service Program ("CCSP"), Independent Care Waiver Program ("ICWP") and the New Options Waiver (NOW) and Comprehensive Supports Waiver Program (COMP) waiver programs.

151.   For Medicaid eligible children denied eligibility or subject to reduced services under GAPP, DCH has offered Medicaid Waivers to them so they may access personal care services.  Providing personal care services to Medicaid eligible children under 21 through a Medicaid Waivers allows Defendant to limit the amount of personal care services available to children to the prescribed limits in the Waiver and to use personal care services as a means to substitute unskilled care for skilled nursing care.

152.   Defendant's scheme is to reduce and otherwise deny skilled nursing care to GAPP participants by asserting that the child's care needs are unskilled. Then, Defendant offers unskilled care (i.e., personal care services) in place of the skilled care denied. Georgia law prohibits unskilled healthcare workers (i.e., personal care providers/certified nursing assistants) from performing skilled nursing tasks. Because the child's condition and skilled care needs remain unchanged, this practice has the effect having unskilled people (parents and CNAs) assume and perform skilled nursing tasks.

153.   Many children who participate in GAPP need personal care services.

39

Defendant provides no way to access these services.

## CASE MANAGEMENT SERVICES

154.   As a state participating in the Medicaid program, Georgia must provide case management services to Medicaid-eligible children under 21 years of age when this service is necessary to correct or ameliorate a child's condition.

155.   "Case management services" are defined in the Medicaid Act, 42 U.S.C. §1396d(t), and the Code of Federal Regulations, 42 C.F.R. §440.169. In pertinent part, case management services include the following types of assistance: Comprehensive assessment and periodic reassessment of individual needs, to determine the need for any medical, educational, social, or other services; development (and periodic revision) of a specific care plan based on the information collected through the assessment; referral and related activities (such as scheduling appointments for the individual) to help the eligible individual obtain needed services; and monitoring and follow-up activities, including activities and contacts that are necessary to ensure that the care plan is effectively implemented and adequately addresses the needs of the individual. 42 C.F.R. §440.169.

156.   Case management services are not available as an EPSDT service for Medicaid-eligible children between the ages of three (3) and 21 in Georgia.

157.   Case management services are available to Medicaid-eligible children under the age of three (3) through the Early Intervention Program, which is administered by the Georgia Department of Public Health through an agreement with DCH. *Part II Policies and Procedures for Early Intervention Case Management Program*, § 702, p. VII-1 (April 2015), *available at* https://www.mmis.georgia.gov/portal/Portals/0/StaticContent/Public/ALL/HANDBOOKS/FV%20April%202015%20Early%20Intervention%20Case%20Management%2001-04-2015%20152115.pdf.

158.   Defendant provides case management services to Medicaid-eligible individuals who receive services in the community through Georgia's various waiver programs. *See, e.g., Part II Policies and Procedures for Independent Care Waiver Services*, § 902.1; *Part II Policies and Procedures for Service Options Using Resources in Community Environments*, § 804, pp. 23-24; *Part III Policies and Procedures for COMP*, § 2901 (all manuals available at https://www.mmis.georgia.gov/portal/PubAccess.Provider%20Information/Provider%20Manuals/tabId/54/Default.aspx ).

159.   Many children who participate in GAPP need personal care services. Defendant provides no way to access these services.

160.   Case management services are not available in Georgia to children participating in GAPP who are over the age of 3.

161.   Case management services assist individuals in gaining and coordinating access to needed medical, social, educational and other services. Case management includes assessing, implementing, coordinating, monitoring, evaluating options and services required to meet an individual's needs and making referrals as needed. These services are necessary to ensure continuity of care. Case management services are necessary to correct or ameliorate the conditions of the Plaintiffs and all children participating in the GAPP program.

## DUE PROCESS REQUIREMENTS

162.   Beneficiaries of Medicaid must be afforded due process of law when Medicaid services are reduced or denied.

163.   Federal regulations require state Medicaid agencies to issue a written notice to every beneficiary whenever the agency takes any action affecting an individual's claim for services. 42 C.F.R. §§ 431.206(b) & (c)(2).

164.   The notice must include (1) a statement of what action the state intends to take; (2) the reasons for the intended action; and (3) the specific regulations that support, or the change in federal or state law that requires, the action. 42 C.F.R. § 431.210.

165.    The constitutional right to due process also imposes notice requirements. The Fourteenth Amendment of the U.S. Constitution prohibits states from depriving a person of life, liberty, or property without due process of law. Plaintiffs have a protectable "property interest" in their Medicaid benefits under the Fourteenth Amendment. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (explaining that when public welfare benefits are terminated, due process requires notice and an opportunity to be heard).

166.    As the U.S. Supreme Court has explained, due process "principles require that a recipient have timely and adequate notice detailing the reasons for a proposed termination." *Id.* In order to be effective, such notice must include both the legal and factual bases underlying the decision. *See id.* at 268 (noting that "recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases").

167.    In Georgia, a consent order was entered in a class action in the Superior Court of Athens-Clarke County, *Favors v. Toal*, No. SU-92-CV-1734-G (1994), that applies to all Medicaid recipients in the State of Georgia who are denied prior approval of Medicaid coverage for medical procedures or services on the ground that such procedures or services are medically unnecessary. *Favors*

requires DCH to provide notice of the denial that includes, among other things, the specific reason supporting DCH's determination that the procedure or service is not medically necessary.

## CLASS ALLEGATIONS

168.   Pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, individual named Plaintiffs M.H. and S.R. bring this action on behalf of themselves and all other persons similarly situated. Plaintiffs bring this action on behalf of a class consisting of "all Medicaid-eligible individuals under the age of 21 who are now, or will in the future be, who participate in the GAPP program and are subjected to the policies and practices of Defendant."

169.   The Plaintiff Class is so numerous that joinder of all of it members is impracticable. Upon information and belief, there are approximately 700 persons in this Class, all of whom are subjected to the illegal policies and practices of the GAPP program.

170.   Common questions of law and fact predominate over questions affecting individual Class members. Questions of law and fact common to members of the Class include but are not limited to whether the GAPP program policies and procedures and their implementation and application violate provisions of the Medicaid Act and the U.S. Constitution.

171.   The claims of the individual named plaintiffs are typical of the claims of the Class as a whole in that the individual named plaintiffs and members of the Plaintiff Class currently are eligible to receive Medicaid-funded EPSDT services (such as skilled nursing care, personal care services, and case management services) who will be affected similarly by the application of the policies and practices of the GAPP program. The claims arise from the same unlawful policies and practices of Defendant.

172.   The individual named plaintiffs will fairly represent and adequately protect the interests of members of the class as a whole. The individual named plaintiffs do not have any interests antagonistic to those of other members of the Plaintiff Class. By filing this action, the individual named plaintiffs have displayed an interest in vindicating their rights, as well as the claims of others who are similarly situated. The relief sought by the individual named plaintiffs will inure to the benefit of members of the Plaintiff Class generally. Plaintiffs are represented by counsel who are experienced, skilled, and knowledgeable about civil rights litigation, disability discrimination, Medicaid law, and practice and procedure in the federal courts.

173.   Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendant has acted, refused to act, or will act on

grounds generally applicable to the Plaintiff Class, thereby making final injunctive and declaratory relief appropriate with respect to the Plaintiff Class as a whole.

174.   Members of the Plaintiff Class share a common need for healthcare services, including skilled nursing, personal care services, and case management, and Defendant's policies and practices limit, reduce, or preclude access to these services in violation of EPDST.

## COUNT ONE

175.   The allegations of the numbered paragraphs above are incorporated herein by reference.

176.    Under the EPSDT provisions of the Medicaid Act, 42 U.S.C. §1396d(r), Plaintiffs have a right to receive Medicaid-funded services that their treating physicians have determined are medically necessary to correct or ameliorate their conditions.

177.   Defendant's proposed reduction from 18 hours per day to 12 hours per day of skilled nursing services (over the course of 8 weeks) places M.H. at serious risk of harm, including complications, hospitalization, and death.

178.   M.H. will suffer irreparable injury as a result of Defendant's reduction of the number of skilled nursing services prescribed to M.H. by his treating physician as medically necessary to correct or ameliorate his conditions.

46

179.   The potential harm to Defendant as a result of DCH continuing to provide coverage for the skilled nursing hours as prescribed for M.H. and as previously approved by DCH is minimal.

180.   M.H. has a substantial likelihood of success on the merits of his claims based upon the Medicaid Act, 42 U.S.C. §§ 1396a, *et seq*.

181.   It is in the public interest that M.H. continue to receive medically necessary care at home and to avoid the increased risk of illness, infection, and other impairment of his health that is created by reducing the medical care he needs.

182.   This is a proper case for the entry, under Fed. R. Civ. P. 65, of a temporary restraining order and preliminary injunction to limit further and greater irreparable harm to M.H.

## COUNT TWO

183.   The allegations of the numbered paragraphs above are incorporated herein by reference.

184.   Defendant has, by the actions and inactions set forth above, violated the Medicaid Act, 42 U.S.C. §§ 1396, et seq., and its implementing regulations by:

(a)   Denying Plaintiffs M.H. and S.R. and the Plaintiff Class all services to which they are entitled under EPSDT, in violation of 42 U.S.C. §

1396d(r)(5);

       (b)    Operating and applying its Medicaid program in a way that denies and limits Plaintiffs M.H.'s and S.R.'s and the Plaintiff Class's access to the EPSDT benefits to which they are entitled;

       (c)    Failing to provide adequate notice to the named Plaintiffs and the Plaintiff Class of decisions to reduce or deny services in violation of the Medicaid Act.

## COUNT THREE

185.   The allegations of the numbered paragraphs above are incorporated herein by reference.

186.   Plaintiffs' and the Plaintiff Class's right to receive the EPSDT benefits to which they are entitled is a right secured by the laws of the United States, including, but not limited to, the Medicaid Act, 42 U.S.C. §§ 1396, et seq.

187.   In violation of 42 U.S.C. § 1983, Defendant has subjected the named Plaintiffs and the Plaintiff Class to the deprivation of their rights under color of a statute, ordinance, regulation, custom, or usage of the state of Georgia.

## COUNT FOUR

188.   The allegations of the numbered paragraphs above are incorporated herein by reference.

189.   Defendant has, by the actions and inactions set forth above, violated the U.S. Constitution by failing to provide adequate notice of decisions to reduce or deny Medicaid services to the Plaintiffs and the Plaintiff Class.

## COUNT FIVE

190.   The allegations of the numbered paragraphs above are incorporated by reference.

191.   Pursuant to 42 U.S.C. § 1988, Plaintiffs should recover reasonable attorneys' fees as part of Plaintiffs' taking action to enforce their federal statutory rights under 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)     Issue preliminary and permanent injunctive relief enjoining Defendant from violating Plaintiffs' rights secured by federal law and requiring Defendant to promptly provide all medically necessary services to which Plaintiffs and Plaintiff Class are entitled under the Medicaid Act;

(b)     Declare that Defendant's actions, inactions and refusal to provide the all medically necessary services to Plaintiffs and Plaintiff Class violate the Medicaid Act;

(c)     Certify this action as a class action and appoint the individual named Plaintiffs as Class representatives;

(d)     Award Plaintiffs their litigation expenses, including reasonable

attorneys' fees; and

(e)     Award such other relief as may be just, equitable and appropriate.

Respectfully submitted, this 29th day of April, 2015.

s/ Joshua H. Norris
Georgia Bar No. 545854

s/ Katherine D'Ambrosio
Georgia Bar No. 780128

Attorneys for Plaintiff

Georgia Advocacy Office
150 E. Ponce de Leon Avenue, Suite 430
Decatur, Georgia 30030
Telephone:   (404) 885-1234
Facsimile:   (404) 378-0031
E-mail:       jnorris@thegao.org
               kdambrosio@thegao.org