IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| M. H.<br>a minor child, by and through his mother and legal guardian, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>FRANK BERRY<br>in his official capacity as Commissioner of the Department of Community Health,<br><br>Defendant. | CIVIL ACTION FILE<br>NO. 1:15-CV-1427-TWT |

**OPINION AND ORDER**

This is a civil rights action. It is before the Court on the Defendant's Motion for Partial Summary Judgment [Doc. 312] and the Plaintiffs' Motion for Summary Judgment [Doc. 314]. For the reasons set forth below, the Court DENIES the Defendant's Motion for Partial Summary Judgment [Doc. 312] and GRANTS the Plaintiffs' Motion for Summary Judgment [Doc. 314].

**I. Background**

On April 29, 2015, Plaintiff M.H. and former Plaintiff S.R. filed their initial complaint against the Georgia Department of Community Health ("DCH"), Georgia's Medicaid agency. The Plaintiffs sought injunctive and declaratory relief for violations of the Medicaid Act and the U.S. Constitution

(*M.H. II*, Doc. 1). Plaintiff S.R. was dismissed from this action due to settlement, leaving M.H. as the sole plaintiff at that time. Prior to filing *M.H. II*, M.H. filed suit against the Defendant for denying his request for increased nursing hours. *M.H. v. Cook*, No. 1:08-cv-2930 TWT, 2013 WL 2252917 (N.D. Ga. May 22, 2013) (*M.H. I*). M.H. obtained the relief he sought, but on summary judgment, suffered adverse rulings on two claims which alleged that the Georgia Department of Community Health violated the Medicaid Act and the Due Process Clause of the United States Constitution by providing inadequate notice of its decisions to deny or reduce benefits and by failing to provide case management services. *Id.*

On November 16, 2015, in response to the Defendant's Motion to Dismiss in *M.H. II*, the Court dismissed M.H.'s claims of inadequate notice and failure to provide case management services as barred by *res judicata* because M.H. had not presented enough new facts to distinguish these claims from those previously dismissed in *M.H. I*. M.H. is a medically fragile Medicaid recipient with certain skilled nursing needs. The Plaintiff M.H.'s only remaining individual claim is whether he receives all medically necessary skilled nursing and personal support services ("PSS"), which includes care to members in the form of feeding, bathing, dressing, personal hygiene, meal preparation, light housekeeping, and assisting with mobility. M.H. seeks six hours of PSS along with eighteen hours of skilled nursing.

On June 14, 2017, the Court granted class certification status on three claims: (1) the Defendant's alleged failure to accord the treating doctor's recommendation appropriate weight when determining a member's nursing hours; (2) the Defendant's alleged improper assumption that the primary caregivers can be taught skilled nursing needs and class members then can be weaned to lower hours than medically necessary or off the program; and (3) the Defendant's alleged failure to consider the capacity of the class members' primary caregivers when determining how many nursing hours are appropriate. The Plaintiffs contend that these policies and practices violate the Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions of the Medicaid Act, which require the state to provide all services necessary to correct or ameliorate the conditions of covered children. The Court designated M.H. as the named plaintiff, with the PSS claim limited to M.H.

In 2018, the Court consolidated the *M.H. II* class action with *C.C. v. Berry, H.K v. Berry*, and *E.C. v. Berry*. The Plaintiffs C.C. and E.C. are also medically fragile Medicaid recipients receiving skilled nursing services through the Georgia Pediatric Program for Children ("GAPP"). The Court previously denied these Plaintiffs' Motion to Amend the Complaint and add two new claims which M.H. was previously barred from asserting by *res judicata*. The Court also denied the Plaintiffs' Motion for Certification of a Subclass regarding notice letters and case management services.

The Georgia Department of Community Health is the single state agency responsible for administering Georgia's Medicaid program. Pls.' SOMF ¶ 1. The DCH issues policies and procedures governing the program. The EPSDT provisions of the Medicaid Act require that Medicaid-eligible children under 21 years of age receive all services necessary to correct and ameliorate their conditions, including in-home skilled nursing services where needed. *Id*. at ¶¶ 2-3; 42 U.S.C. § 1396d(r)(5). DCH approves and pays for skilled nursing services for Georgia children through the Georgia Pediatric Program ("GAPP"). *Id*. at ¶ 4.

DCH contracts with Alliant Health Solutions, formerly known as the Georgia Medical Care Foundation, for reviewing requests for skilled nursing services in the GAPP program. *Id*. at ¶ 5. Alliant determines the number of hours per week of skilled nursing services that should be approved as medically necessary for GAPP participants and communicates those decisions to the participant's caregiver and nursing agency. *Id*. at ¶ 6. Most GAPP participants have multiple physicians in different specialties attending to their needs. *Id*. at ¶ 13. Skilled nursing tasks for GAPP participants can include assessing placement and efficacy of a G-tube, feeding a patient through a G-tube, assessing the efficacy of a tracheostomy, deep suctioning, determining the need for PRN medications, and performing assessments. *Id*. at ¶ 16. Under the Georgia Nurse Practice Act, skilled nurses are the only persons who can be paid to perform skilled nursing tasks. *Id*. at ¶ 17. A DCH-approved nursing

agency, with approval from a treating physician, makes a request for in-home skilled nursing services to seek to enroll a Medicaid-eligible, medically fragile child into the GAPP program. *Id*. at ¶ 18. If a change in condition occurs, the nursing providers and physician can submit a request to change the number of hours approved. *Id*. DCH and Alliant require documentation to support requests for skilled nursing if applicable, including nursing notes, hospital records and discharge summaries, an Individual Education Plan, a caregiver checklist noting the caregiver's competency, and a Statement of Medical Necessity signed by the nursing agency and treating physician. *Id*. at ¶ 19. In the Statement of Medical Necessity, the treating physician and nursing agency summarize the diagnoses and conditions of the GAPP participant, and treatments and medications needed to support the number of skilled nursing hours being requested. *Id*. at ¶ 20. Alliant's "medical review teams" review such requests, determine how many skilled nursing hours per week that Alliant deems medically necessary, and inform caregivers of GAPP participants and their nursing agencies how many skilled nursing hours per week are approved. *Id*. at ¶ 6.

Alliant's "medical review teams" consist of two or three nurses and one or two physicians who review requests for skilled nursing hours in the GAPP program. *Id*. at ¶ 21. As of late 2019, the GAPP review nurses for Alliant were Brianne Taylor and Stephanie Rooney. *Id*. at ¶ 22. The doctors engaged on the review teams were Dr. Schuessler and Dr. Zurbrugg. *Id*. Since 2015, several

other nurses, including Reams, Sehenuk, Purcell, Bifaro and Jones have participated in the GAPP medical review teams, and Dr. Papciak has participated as a physician. *Id*. at ¶ 23. The medical review teams convene two meetings each week to review GAPP participants' skilled nursing hours requests. *Id*. at ¶ 24. Each team reviews about twenty-five cases in approximately one hour, although the amount of case review and duration of the meeting may vary. *Id*. In each case, one nurse, the reviewing nurse, is the only team member to review the submitted documentation. *Id*. at ¶ 25. The reviewing nurse manually prepares a scoresheet and verbally reports on diagnoses and recommended hours to the rest of the team. *Id*. at ¶ 25. The other nurse or nurses may attend the review meeting in person, but the one or two doctors serving on the teams in recent years attend by phone and never have actual records before them as they listen to the reviewing nurse's verbal summaries. *Id*. at ¶¶ 26-27. A DCH employee occasionally sits in on the meetings. *Id*. at ¶ 28.

The scoresheet used by the reviewing nurse is a form developed by Dr. Gary Miller and others at Alliant and approved by DCH. *Id*. at ¶ 29. The scoresheet lists various possible conditions, diagnoses, and treatments that medically fragile children may have. *Id*. at ¶ 30. The reviewing nurse checks the box by each present in the case of the GAPP participant. *Id*. The boxes yield a certain number of points for each listed condition, and then a table converts ranges of total points into wide ranges of total possible skilled nursing hours.

*Id*. The Plaintiffs allege that the scoresheet has not been scientifically tested for accuracy in determining medically necessary hours. *Id*. at ¶ 32. Alliant revised the scoresheet in October 2015 which allegedly resulted in producing lower ranges of skilled hours. *Id*. at ¶ 33.

The brief discussion and recommendation on each GAPP participant whose case is being reviewed allegedly focuses on the reviewing nurse's summary in the scoresheet, not on the Statement of Medical Necessity signed by the physician and nursing agency. *Id*. at ¶ 34. The reviewing nurse's recommendation based on the scoresheet is typically accepted. *Id*. at ¶ 35. In communicating decisions approving fewer hours than requested to the nursing agency and caregiver, Alliant uses a boilerplate letter referring to general DCH policies and does not address the reasons the treating physician requested a higher number, as set out in the Statement of Medical Necessity. *Id*. at ¶ 36.

At DCH's direction, Alliant review team members review requests for skilled nursing services with the general assumption that all caregivers are capable of being trained to perform all skilled nursing tasks, except for a head to toe assessment. *Id*. at ¶ 37. DCH formerly described the objective of the GAPP program as "teach and wean," meaning that caregivers would be taught to do the needed skilled nursing tasks and then the participant and caregiver would be weaned off the number of skilled nursing initially deemed medically necessary to a lower number, with the caregiver expected to make up the difference in skilled hours. *Id*. at ¶¶ 38-40. The Plaintiffs allege that Alliant

consistently does not consider any possible limitations on the capacity of the caregiver to provide care for the participant, such as a job, no family help, other kids to care for, or individual health conditions. *Id.* at ¶ 41. DCH and Alliant consider such possible limitations as "social factors" which are not considered in determining the medically necessary hours for each participant. *Id.* at ¶ 42. The Plaintiffs allege that the failure of DCH through Alliant to give sufficient weight to the treating physician's opinion, the "teach and wean" approach, and the failure to consider limitations on the ability of the caregiver to perform skilled nursing services all contribute to GAPP participants being approved for significantly fewer skilled nursing hours than needed. *Id.* at ¶¶ 43, 44.

The Court has considered eight individual cases of named Plaintiffs in ruling on motions for temporary restraining orders and/or preliminary injunctions. In each case, the Court granted injunctive relief to require DCH to provide the skilled hours recommended by the treating physician, instead of the lower hours approved by Alliant and DCH. Regarding named Plaintiff M.H., the Court ordered DCH to provide 18 hours of skilled nursing per day, finding that DCH's decision to reduce to 12 hours per day was not based on medical necessity but instead on the policy and practice of the GAPP program to wean nursing care if a child has been medically stable and on DCH's failure to give adequate consideration to the treating physician's determination of medical necessity. *Id.* at ¶¶ 45-59.

On July 31, 2020, the Defendant Frank Berry, Commissioner of the Georgia Department of Community Health, filed a Motion for Partial Summary Judgment arguing for judgment in its favor regarding the three class allegations and M.H.'s individual claim. On July 31, 2020, the Plaintiffs filed a Motion for Summary Judgment as to the class allegations.

## II. Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## III. Discussion

In this class action, the Plaintiffs allege that the Defendant, Commissioner of the Georgia Department of Community Health, violated the Medicaid Act by failing to approve and pay for the amount of in-home skilled nursing care that is medically necessary for covered children through the Georgia Pediatric Program. The Plaintiffs claim that these failures are due in part to system wide deficiencies in the process by which DCH and its agent, Alliant, determine the number of hours that will be approved. Specifically, the Plaintiffs allege: (1) DCH fails to give sufficient weight to the treating physician's determination of the amount of skilled nursing hours that are needed; (2) DCH imposes a "teach and wean" program under which caregivers are taught skilled nursing tasks, then "weaned" from skilled nursing hours originally considered necessary; and (3) DCH fails to consider limitations on a particular caregiver's capacity to provide skilled nursing care to a medically fragile child. The Plaintiffs contend that these policies and practices violate the Early and Periodic Screening, Diagnostic, and Treatment provisions of the Medicaid Act, which require the state to provide all services necessary to correct or ameliorate the conditions of covered children. The Plaintiffs request that the Court declare these policies and practices unlawful and enjoin them. The Defendant requests that the Court grant judgment in its favor regarding the class allegations and Plaintiff M.H.'s individual claim that he does not receive sufficient personal support services under Medicaid.

The Medicaid Act mandates that states that participate in the Medicaid program provide EPSDT services to Medicaid-eligible children under twenty-one years of age. *See* 42 U.S.C. §§ 1396(a)(43) and 1396d(r). As the Centers for Medicare and Medicaid Services explains:

> The EPSDT benefit is more robust than the Medicaid benefit for adults and is designed to assure that children receive early detection and care, so that health problems are averted or diagnosed and treated as early as possible. The goal of EPSDT is to assure that individual children get the health care they need when they need it – the right care to the right child at the right time in the right setting.

*EPSDT: A Guide for States*, at 1 (June 2014), https://www.medicaid.gov/sites/default/files/2019-12/epsdtcoverageguide.pdf. Under EPSDT, eligible children must receive all services and treatments covered by the Medicaid Act that are necessary "to correct or ameliorate" any physical and mental illnesses and conditions discovered during a screening. *See* 42 U.S.C. § 1396d(r)(5); *see also Moore v. Reese*, 637 F.3d 1220, 1235 (11th Cir. 2011). "[P]rivate duty nursing services" are included in the treatments and services under the Medicaid Act. *See* 42 U.S.C. § 1396d(a)(8).

In providing private duty nursing services under EPSDT, Georgia's Medicaid Plan must include reasonable standards for determining the extent of private duty nursing services under the state Plan which are consistent with the objectives of EPSDT to "correct or ameliorate" a child's conditions. 42 U.S.C. § 1396a(a)(17). The state Medicaid agency may place appropriate limits on private duty nursing services based on such criteria as medical necessity.

42 C.F.R. § 440.230(d). The state may review the medical necessity of the amount of private duty nursing services prescribed by the treating physician and make its own determination of medical necessity. *See Moore*, 637 F.3d at 1257. In cases where the amount of EPSDT services prescribed by a treating physician is disputed by the state, the Eleventh Circuit identifies "the pivotal issue" as whether the amount of EPSDT services provided by the state are sufficient in amount to "reasonably achieve" the purposes of the services to correct or ameliorate the plaintiff's condition. *Id.* at 1257-58.

> When a state Medicaid agency has exceeded the bounds of its authority by adopting an unreasonable definition of medical necessity or by failing to ensure that a required service is 'sufficient in amount, duration, and scope to reasonably achieve its purpose,' aggrieved Medicaid recipients have recourse in the courts.

*Id.* at 1259 (citing 42 C.F.R. § 440.230(c),(d)). Medicaid is a joint federal-state cooperative program where states devise and fund their own medical assistance program subject to the requirements of the Act. *See Moore*, 637 F.3d. at 1231. Section 1396a(a)(17) requires the state plan to "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives" of the Act. *Id.* at 1232 (quoting 42 U.S.C. § 1396(a)(17)).

The Court addresses each of the class allegations in turn. First, the Plaintiffs claim that DCH fails to give sufficient weight to the treating physician's determination of the amount of skilled nursing hours that are

needed when determining a child's nursing hours under the Medicaid Act. The Court agrees. Under the Medicaid Act, the treating physician has a role in determining what treatment is necessary to "correct or ameliorate" a Medicaid beneficiary's condition. ESPDT defines the role for the treating physician as the "screening service" who takes "a comprehensive health and developmental history," performs "a comprehensive unclothed physical exam" and performs "laboratory tests" "to determine the existence of certain physical or mental illnesses or conditions." 42 U.S.C. §§ 1396d(r)(1)(A)&(B). ESPDT requires the provision of all necessary care "to correct or ameliorate" any conditions detected by the screening service. 42 U.S.C. § 1396d(r)(5). The Statement of Medical Necessity submitted by the treating physicians comprises the findings of the EPSDT screening for each GAPP participant.

The Court agrees with the Plaintiffs that Alliant's review process when determining the allotment for nursing hours for each participant minimizes the skilled care needs identified by the treating physician in the Statement of Medical Necessity. DCH and Alliant are not permitted under the Medicaid Act to note the hours recommended by the treating physician and then disregard that recommendation and the reasons for it in arriving at a much lower total. Numerous DCH and Alliant employees have testified regarding the failure to consider the treating physician's recommendation. Dr. Kathryn McCusker provided an expert report reviewing the DCH and Alliant process by looking at documentation for thirty-seven GAPP participants. Pls.' SOMF, at ¶ 151.

The testimony from the DCH and Alliant employees supports Dr. McCusker's opinion that recommendations from the treating physicians are noted but not given sufficient weight in the decision-making process. Most often only one GAPP medical review team member, the reviewing nurse, looks at the treating physician's recommendation and other medical records. *Id.* at ¶ 25. The reviewing nurse's proposal for the number of hours to be approved is driven by the Alliant "scoring sheet," which does not include consideration of the treating physician's recommendation, although the physician's recommendation may be read aloud during review meetings. *Id*. at ¶¶ 29, 34. Neither of the two doctors who have alternated as the doctor on the Alliant review team for the last three years attends the review sessions in person or even sees the treating physician's recommendation – they only participate by phone, to hear a verbal summary of each case by the review nurse. *Id*. at ¶ 27. The reviewing nurse generally only sees the physician's recommendation. The GAPP medical review team typically adopts the recommendation of the single review nurse derived from the scoresheet, as the skilled nursing hours medically necessary for the participant. *Id*. at ¶ 35. The adverse action notice letters do not address or respond to the treating physician's recommendation. *Id*. at ¶ 36.

The Court has already granted injunctive relief in multiple cases involving members of the class where the Defendant failed to adequately consider the treating physician's recommendation and denied necessary skilled nursing care. Considering the testimony of the Alliant and DCH witnesses, the

opinions of the Plaintiffs' experts, and the affidavits of various class members' treating physicians and treating nurses, the records show that the Defendant fails on a class-wide basis to give sufficient weight to the treating physician's determination of the amount of skilled nursing hours that are needed. The Defendant has approved a process that gives insufficient weight to the treating physician's determination of medical necessity. As the Eleventh Circuit explained in *Moore*, 637 F.3d at 1257, the treating physician is "a key figure" and initially determines what amount of nursing services are medically necessary. The state is not empowered to act as the "final arbiter" of medical necessity and to arbitrarily ignore the reasons given in the treating physician's recommendation of higher hours. *Id*. at 1258-59.

Next, the Plaintiffs claim that the Defendant imposes a "teach and wean" policy under which caregivers are taught skilled nursing tasks and the child is then weaned from skilled nursing hours originally considered necessary. Although the DCH has recently moved away from the express "teach and wean" language, the Court agrees that the policy still exists. And when the policy results in a significant decrease in nursing hours below the level medically necessary, the Defendant violates the Medicaid Act. As exemplified in many of the class members' situations outlined in their motions for preliminary injunctions, the weaning reductions are quite substantial over time and reflect the assumption by DCH and Alliant that the caregiver, once taught, can take over responsibility for major portions of the participant's

skilled nursing care. The Defendant concedes that Alliant frequently establishes a number of skilled nursing hours designed to meet the child's needs at the outset and then reduces those hours significantly over a period of time as the caregiver is presumed to have been sufficiently trained to perform many necessary skilled tasks. Pls.' SOMF, at ¶¶ 38-40.

The Court has already seen the existence of the "teach and wean" policy when granting multiple class members' motions for preliminary injunctions. In these cases, the Defendant's decision to reduce the skilled nursing hours were not based on medical necessity but arbitrarily shifted more of the burden of a child's care to the caregiver without any consideration of caregiver's capacity to provide the care. For example, in M.H.'s case, the Alliant nurse who reviewed his case testified that M.H.'s health had not improved, and his skilled care needs remain unchanged. But the significant reductions were due to the policy and practice of the GAPP program to wean nursing care if a child has been medically stable.

The Medicaid Act defines "private duty nursing services" as "nursing services for beneficiaries who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility." 42 C.F.R. § 440.80. These services must be provided by "a registered nurse or a licensed practical nurse" and must be "[u]nder the direction of the beneficiary's physician . . . ." *Id*. As noted by the Plaintiffs, in *Alberto N. v. Hawkins*, No. 6:99-cv-459, 2007 WL

8429756, at *13 (E.D. Tex. June 8, 2007), the Eastern District of Texas found that Texas Medicaid's policies "requiring parents or guardians to provide a portion of their child's medically necessary nursing services deprive these children of their entitlement to all medically-necessary nursing services, in violation of the Medicaid Act, and are, therefore, invalid." The Court agrees that the determination of whether private nursing services are medically necessary should be based on whether a service is medically necessary to correct or ameliorate a beneficiary's condition, not on whether or not the caregiver is able to provide those skills. The Medicaid Act requires private duty nursing services be provided by licensed nurses. It does not provide for the delegation of activities which require the knowledge and skill of a licensed nurse. Nothing in the Medicaid Act or its implementing regulations allows states to avoid their obligation to provide medically necessary services based upon non-medical criteria. The Court finds that the policy under which caregivers are supposedly taught skilled nursing tasks and the child is then weaned from skilled nursing hours originally considered necessary is unlawful and undermines the purpose of the Medicaid Act.

Finally, the Plaintiffs argue that the Defendant failed to consider the capacity of the class members' primary caregivers when determining how many nursing hours are appropriate. Even if the Defendant's teach and wean policy was lawful under the Medicaid Act, it could only be accurately and fairly executed by considering what amount of skilled nursing assistance can

reasonably be expected to be provided by the caregiver. That determination would require consideration of limitations on the capacity of a particular caregiver, social factors like jobs, other children, the caregiver's own health, and so forth. But since the Defendant should not be implementing a teach and wean policy, this claim is moot. Because the undisputed facts show that the alleged policies and practices in the class allegations exist and that they cause numerous class members to be approved for fewer hours than are medically necessary under the Medicaid Act, the Court grants the Plaintiffs' Motion for Summary Judgment.

Aside from the class allegations' argument in its Motion for Partial Summary Judgment, the Defendant also maintains that the Georgia Medical Care Foundation, currently known as Alliant, is a necessary party to this action under Fed. R. Civ. P. 16. The Court disagrees. DCH is the single state agency tasked with administering the Medicaid program and has the ultimate responsibility to the Plaintiffs in this action. *See Moore*, 637 F.3d at 1238 (citing 42 U.S.C. § 1396a(a)(5)). DCH has an obligation to ensure that it contracts with parties that will adequately carry out DCH's obligations under the Medicaid Act. Complete relief can be afforded without joining the GMCF. Additionally, the Defendant seeks summary judgment on Plaintiff M.H.'s individual claim for personal support services. But the Defendant's argument is unsupported by any specific facts or cites to the record sufficient to refute

Plaintiff M.H.'s claim. Thus, the Court denies the Defendant's Motion for Partial Summary Judgment.

## IV. Conclusion

For the reasons stated above, this Court DENIES the Defendant's Motion for Partial Summary Judgment [Doc. 312] and GRANTS the Plaintiffs' Motion for Summary Judgment [Doc. 314].

SO ORDERED, this 29 day of March, 2021.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge